**IN THE COURT OF APPEALS OF IOWA**

No. 18-0001
Filed December 5, 2018


**EDWARD J. KOVARIK,**
          Plaintiff-Appellant,

**vs.**

**IOWA DEPARTMENT OF REVENUE,**
          Defendant-Appellee.
_____


Appeal from the Iowa District Court for Howard County, Margaret L. Lingreen, Judge.


A taxpayer challenges orders by the Iowa Department of Revenue denying him relief under the Iowa Tax Amnesty Act of 2007 and disallowing business losses claimed in four tax years. **AFFIRMED.**


Kevin E. Schoeberl of Story Schoeberl & Seebach, LLP, Cresco, for appellant.

Thomas J. Miller, Attorney General, and Hristo Chaprazov, Assistant Attorney General, for appellee.


Heard by Tabor, P.J., and Mullins and Bower, JJ.

**TABOR, Presiding Judge.**

Seeking tax amnesty was a costly move for Edward Kovarik. He petitioned under the Iowa Tax Amnesty Act of 2007 and attached his state returns for 2003 through 2006. The Iowa Department of Revenue (the department) not only denied amnesty but disallowed deductions claimed for business expenses on the attached returns. Kovarik unsuccessfully pursued an administrative remedy and judicial review. He continues to challenge the revenue department decisions in this appeal.

Like the district court, we conclude the department correctly denied amnesty, finding Kovarik failed to file his 2002 return and owed outstanding obligations from the four following years. We also agree Kovarik must repay amounts he improperly deducted as "hobby losses" in those tax years.

## I. Facts and Prior Proceedings

Kovarik grew up on an eighty-acre farm near Elma, Iowa. In his youth, Kovarik helped out on the acreage and joined clubs such as 4-H and Future Farmers of America. But after high school he left rural Iowa. He attended college in Washington, D.C. and served in the United States Navy from 1956 to 1960.

He spent his career in the railway industry. Because his work involved transfers around the country, Kovarik ended up owning two condominiums—one in Forest Park, Georgia, and one in Roanoke, Virginia. Kovarik retired in 1990 and returned to Iowa. In his retirement, Kovarik continued to do consulting as a freight car inspector. At first, he lived with his sister and her husband in Marion. When his brother who stayed on the farm died in 2003, Kovarik stepped in to manage the family's land. Kovarik moved back to Howard County in 2006.

One year later, our legislature enacted the Iowa Tax Amnesty Act of 2007. 2007 Iowa Acts ch. 177. The program opened a narrow window for taxpayers to meet delinquent liabilities with fifty-percent less interest and no penalties.[1] The program was available to taxpayers who had "tax liabilities delinquent as of December 31, 2006, including tax due on returns not filed, tax liabilities owed to the department as of December 31, 2006, or tax liabilities not reported nor established but delinquent as of December 31, 2006." *Id.* § 3. Taxpayers could apply for amnesty from September 4 through October 31, 2007. *Id.*

Kovarik applied on the last day. In his October 31 application, he checked a box stating: "Return has not been filed." Kovarik attached his unfiled return for tax year 2006 and the amount due of $299.15 (including $293 in taxes and $6.15 representing "one-half interest"). He also attached copies of his filed tax returns for 2003, 2004, and 2005—stating he owed no additional tax for those years.

On November 9, the revenue department notified Kovarik his amnesty request was under review. For its review, the department needed information about his failure to file a 2002 Iowa tax return.[2] The department also sought documentation to verify the expenses Kovarik claimed on his filed tax returns. The department set a fifteen-day deadline for Kovarik to respond.

As the department awaited Kovarik's response to its inquiry about the unfiled 2002 return, it began scrutinizing his 2003 through 2006 filed returns.

---

[1] According to Dennis Schutt, a forty-year veteran of the Iowa Department of Revenue, the Act's purpose was to "encourage people to file correct returns" and "pay the tax and half the interest." Schutt testified the 2007 Act required taxpayers to file all missing returns with the department to qualify for amnesty.

[2] The department's query of the Internal Revenue Service (IRS) showed no federal 2002 return on file for Kovarik.

There, the department "discovered a pattern of substantial losses and little or no income being reported on them," according to investigator Schutt. Kovarik had reported losses for his railway consulting business, condominium rentals, and the farming operation.

After some back and forth with Kovarik, the department denied his request for tax amnesty in late November 2007. The department reasoned Kovarik did not qualify for amnesty because he did not file a 2002 Iowa individual income tax return. The department also disallowed Kovarik's claimed business losses for 2003 through 2006. As a result, the department assessed Kovarik additional income tax, penalty, and interest for those four years totaling $13,182.98.

Kovarik filed an unsuccessful protest. An administrative law judge (ALJ) affirmed the denial of amnesty and found the additional assessment to be "essentially correct." The ALJ noted the "unpaid tax liability" from 2003 through 2007 provided the department "an additional basis for denial of Kovarik's application for amnesty." The ALJ's proposed order directed the department to revise the assessment to allow Kovarik to deduct expenses related to his rental of the tillable farmland. The department's director affirmed the ALJ's proposed order. Kovarik sought judicial review. The district court affirmed the director's final order. Kovarik now appeals the judicial review.

## II.    Scope and Standards of Review

The Iowa Administrative Procedure Act governs our review. Iowa Code § 17A.19(10) (2017); *Nance v. Iowa Dep't of Revenue*, 908 N.W.2d 261, 267 (Iowa 2018) (citing *Lange v. Iowa Dep't of Revenue*, 710 N.W.2d 242, 246 (Iowa 2006)). In reviewing the judicial review order, we act in the same appellate capacity as the

district court. *Nance*, 908 N.W.2d at 267. If we reach the same conclusions as the district court did about the agency action under the administrative standards, we affirm. *Id.* Otherwise we reverse. *Id.*

Several different standards are at play here. The first question is whether substantial evidence supported the department's action. *See* Iowa Code § 17A.19(10)(f). Evidence is substantial if its quantity and quality "would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." *Id.* § 17A.19(10)(f)(1). When we assess the evidentiary support for the agency's fact findings, we consider proof detracting from those findings, as well as evidence in support of them. *Nance*, 908 N.W.2d at 267 (citing *Lange*, 710 N.W.2d at 247). We defer to credibility determinations by the "presiding officer" who had an opportunity to observe the demeanor of the witnesses. *Id.* (citing *Lange*, 710 N.W.2d at 247); *see also* Iowa Code § 17A.19(10)(f)(3).

The second question is whether the department properly applied the law to the facts—an application vested in the department's discretion. *See Nance*, 908 N.W.2d at 267. So we only reverse the department's application of the law to the facts if we determine the application was "irrational, illogical, or wholly unjustifiable." *See id.* (citing *Iowa Ag Constr. Co. v. Iowa State Bd. of Tax Review*, 723 N.W.2d 167, 174 (Iowa 2006)); *see also* Iowa Code § 17A.19(10)(m).

The third question involves a constitutional challenge. We review de novo the taxpayer's claim the department violated his right to due process by not

allowing him enough time to show he was eligible for tax amnesty.  *See ABC Disposal Sys., Inc. v. Dep't of Nat. Res.*, 681 N.W.2d 596, 605 (Iowa 2004).

### III.    Discussion

### A. Amnesty

Kovarik first contests the denial of his application for tax amnesty.  Before addressing his points of contention, we pause to consider the purpose of offering amnesty to delinquent taxpayers.

In May 2007, Iowa joined a growing number of states implementing tax amnesty programs.  *See* Jason A. Bremer & Belinda S. Morgan, *States Adopt A Profitable "Carrot and Stick" Approach to Tax Amnesty*, J. Multistate Tax'n, July 2004, at 6, 8 (observing "state legislatures are increasingly turning to tax amnesty programs as a means of immediately pumping much-needed cash into their state treasuries").  "Generally speaking, tax amnesty programs raise short-term revenue by inducing taxpayers to come forward and pay outstanding tax liabilities." *Id.* at 8. Iowa's amnesty program followed that norm.  In the words of investigator Schutt, Iowa taxpayers were "given a chance to wipe their slate clean" if they filed all the required returns.

Under the Iowa Act, delinquent taxpayers could apply for amnesty subject to some restrictions:

> The tax amnesty program shall provide that upon written application by a taxpayer and payment in full by the taxpayer of amounts due from the taxpayer to this state for a tax covered by the tax amnesty program plus interest equal to fifty percent of the interest that is due, the department shall not seek to collect any other interest or penalties which may be applicable.  The department shall not seek civil or criminal prosecution for a taxpayer for the period of time for which amnesty has been granted to the taxpayer.  *Failure to pay all tax liabilities due the state and delinquent as of December 31, 2006,*

*shall invalidate the amnesty.* Amnesty shall be granted for only the periods specified in the application and only if all amnesty conditions are satisfied by the taxpayer.

2007 Iowa Acts ch. 177, § 3 (emphasis added).

Here, the department determined Kovarik did not qualify for amnesty because he failed to file his 2002 Iowa individual income tax return. On appeal, he attacks that determination on both factual and legal fronts.[3]

Starting with the factual argument, Kovarik asserts he filed his 2002 Iowa return "with no tax due." But he blames trouble with records retention as the reason he cannot produce proof of that filing.[4] He also asserts IRS publications suggested he need only retain records for three years. He alleges these circumstances constituted "good cause" for not filing his 2002 return.[5] From this premise, he asserts the department should have granted amnesty.

As noted above, the ALJ's credibility findings command deference under our substantial-evidence review. *See* Iowa Code § 17A.19(10)(f)(3). Noting Kovarik did not produce a copy of a 2002 return and the department and the IRS had not record of receiving a return, the ALJ decided "the preponderance of evidence in the record supports the department's finding that Kovarik did not file an Iowa tax return for the 2002 tax year." *See Broadlawns Med. Ctr. v. Sanders*, 792 N.W.2d 302, 306 (Iowa 2010) (noting we give deference to credibility

---

[3] Additionally, Kovarik asserts the ALJ "never affirmed the department's denial" of his tax amnesty application. The record disproves this assertion. In her conclusions of law, the ALJ wrote: "the [d]epartment acted correctly in denying his amnesty application based upon his failure to file an Iowa return for the 2002 tax year."

[4] Kovarik alleges he could not recreate his 2002 tax return because he lost his records in a 2012 burglary at the farmstead. But the department first asked for more information from Kovarik in November 2007.

[5] As the department points out in its appellee's brief, the 2007 Amnesty Act does not mention "good cause" as an excuse for not filing a state tax return.

determinations of the "presiding officer"). Giving due deference, we find substantial evidence supports the finding Kovarik did not file a 2002 return.

Next we turn to the application of law to that fact. *See* Iowa Code § 17A.19(10)(m). Kovarik argues the 2007 Act "does not specifically state that unfiled tax returns will result in the denial of the application for tax amnesty." Rather, he reads the Act's "amnesty conditions" as including: (1) filing an application; (2) paying taxes that are due; and (3) filing those returns that are required.[6] Kovarik maintains he complied with these conditions.

In response, the State highlights this amnesty restriction: "Failure to pay all tax liabilities due the state and delinquent as of December 31, 2006 shall invalidate the amnesty." 2007 Iowa Acts Ch. 177, § 3. Based on that restriction, the State believes Kovarik's failure to file his 2002 Iowa return "proved fatal to his tax amnesty application because the only way for [him] to prove that he did not have a delinquent tax liability as of December 31, 2006 related to tax year 2002 was to file his 2002 Iowa return." In addition to the failure to file his 2002 return, both the ALJ and district court cited Kovarik's unpaid tax liabilities for 2003 through 2006 as another ground for denying his amnesty application.

Like the district court, we conclude the director properly upheld the denial of Kovarik's tax amnesty application. The department's decision was not "irrational, illogical, or wholly unjustifiable." *See* Iowa Code § 17A.19(10)(m). The 2007 Act required taxpayers to pay all outstanding tax liabilities as of December

---

[6] The ALJ reasoned: "Given Kovarik's ongoing income, he would have been required to file an income tax return in 2002."

31, 2006, to qualify for amnesty. Because Kovarik owed additional amounts on his state tax bill, the department could deny his application.

Finally, Kovarik raises a procedural due process challenge.[7] *See generally* Iowa Code § 17A.19(10)(a). Specifically, Kovarik complains the department gave him only fifteen days to secure a copy of his missing 2002 return. But Kovarik notified the department within eleven days he no longer had the paperwork to recreate his 2002 return. He did not ask for an extension or otherwise challenge the reasonableness of the department's deadline. He also fails to establish how more time would have helped him. The department held a hearing and considered his position. On this record, Kovarik cannot show the department's deadline violated his right to procedural due process. *See Behm v. City of Cedar Rapids*, ___ N.W.2d ___, ___, 2018 WL 4178517, at *33 (Iowa 2018) (explaining procedural due process claim cannot focus on only part of the process afforded, "but must consider the entire panoply of available procedures").

Because Kovarik fails to prove he is entitled to relief under any subdivision of section 17A.19(10), we affirm the director's denial of tax amnesty.

## B. Business Losses for Railroad Consulting And Condominium Rental

Kovarik next argues the director wrongly decided he could not deduct business losses related to his railroad consulting activities and condominium rentals. In challenging the tax assessments resulting from the department

---

[7] Procedural due process requires notice and opportunity to be heard in a proceeding adequate to safeguard the constitutional protection invoked. *See State v. Seering*, 701 N.W.2d 655, 666 (Iowa 2005) (quoting *Bowers v. Polk Cty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002)), *superseded by statute on other grounds*, 2009 Iowa Acts ch. 119, *as recognized in In re T.H.*, 913 N.W.2d 578, 587–88 (Iowa 2018).

disallowing his claimed expenses, Kovarik bears the burden of proof. *See Camacho v. Iowa Dep't of Revenue & Fin.*, 666 N.W.2d 537, 542 (Iowa 2003).

But before we address the particulars of his argument, we look first to the law on "hobby losses." *See* 26 U.S.C. §§ 162, 183(a) (2006).[8] Under our state statutes, the starting point for calculating taxable income is the adjusted gross income "as properly computed for federal income tax purposes under the Internal Revenue Code." Iowa Code § 422.7. The Internal Revenue Code allows taxpayers to deduct their ordinary and necessary business expenses. *See* 26 U.S.C. § 162(a). Deductibility depends on whether the taxpayer engaged in the activity for profit. *Comm'r v. Groetzinger,* 480 U.S. 23, 35 (1987). Taxpayers don't need to have "a reasonable expectation of a profit." *Meinhardt v. Comm'r*, 766 F.3d 917, 919 (8th Cir. 2014) (quoting *DKD Enters. v. Comm'r*, 685 F.3d 730, 735 (8th Cir. 2012)). But they must have "a good faith intention of making a profit or of producing income." *Id.* (quoting *DKD Enters.*, 685 F.3d at 735). When deciding if the taxpayer was operating with "a genuine profit motive," the factfinder is not bound by the taxpayer's stated intention. *Id.* (quoting *DKD Enters.*, 685 F.3d at 735).

To help apply the profit-motive standard, the IRS drafted a list of nine factors based on a body of case law. *Portland Golf Club v. Comm'r*, 497 U.S. 154, 175 (1990). The factors include: (1) how the taxpayer carries on the activity; (2) the

---

[8] In passing section 183, Congress wanted to prevent taxpayers from taking deductions for activities carried on as hobbies rather than businesses. Thomas J. Gallagher, 10 Am. Jur. 2d *Proof of Facts* § 165 (1976 & Supp. Sept. 2018). This "hobby loss" provision aimed to ensure that taxpayers did not aggregate their personal activities of taxpayers with their income-producing activities. *Id.* Subject to exceptions, section 183 allows deductions for activities only if they are engaged in for profit. *Id.*

taxpayer's expertise; (3) time and effort expended by the taxpayer in carrying on the activity; (4) the expectation assets used in the activity may appreciate in value; (5) the success of the taxpayer in conducting similar or dissimilar activities; (6) history of taxpayer income and losses from the activity; (7) the amount of occasional profits earned, if any; (8) the taxpayer's financial status; and (9) personal pleasure or recreation derived from the activity. *Id.* (citing 26 C.F.R. §§ 1.183–2(b)(1)–(9)). As discussed below, the department properly applied this test in determining Kovarik was not operating with a sincere profit motive when he claimed business losses for his consulting and condominium-rental activities.

### 1. Railroad Consulting

After retiring in 1990 from his long-held railroad job, Kovarik did consulting as a freight car inspector. He worked through a firm that put him in touch with manufacturers who needed inspections. The first few years of consulting were busy ones, according to Kovarik. But then demand dwindled. Kovarik attended a rail association trade show each year in an attempt to cultivate contacts but was unsuccessful in drumming up much business. In information he provided to the department in 2009, Kovarik acknowledged he had not realized a profit from consulting for any of the seventeen years he had been conducting the activity.

On his Schedule C, Kovarik reported $7380 in income from rail car inspections in 2004 but no income from this activity in 2003, 2005, or 2006. At the same time, he reported business expenses for his consulting efforts totaling $45,021.59 for those four years. The expenses included travel, lodging, meals, and work clothing. Given the claimed expenses, his net losses—disallowed by the department—totaled $37,641.59.

The ALJ's decision, affirmed by the director, carefully stepped through each of the nine factors listed by the IRS in determining if Kovarik undertook the consulting activity with a true profit motive.   An abbreviated version of that analysis follows:

(1) Kovarik's manner of carrying out the activity weighed heavily against finding he aimed to make a profit.  His recordkeeping was unprofessional.  He did not plan the logistics well.  Kovarik made little effort to reduce overhead.  And he did not adapt to a changing market.

(2) Kovarik's expertise likewise did not support a profit motive.  Kovarik brought substantive knowledge of rail inspections to the endeavor but had no background in operating a profitable consulting business.

(3) The time and effort Kovarik expended did not reveal an intent to derive a profit from the consulting business.  He worked an estimated 300 hours in 2004 but had no income from inspections in the other three tax years at issue.  Still, he incurred the expense of monthly visits to the Forest Park condominium.

(4) Because Kovarik purchased no assets for the consulting business, appreciation of asset value was not relevant.

(5) Kovarik offered no evidence of other relevant business ventures.

(6)–(7) Kovarik experienced a history of losses with no occasion for profit, despite his testimony that business boomed in the early years.  These factors tilted against finding he intended to turn a profit in consulting.

(8) Kovarik's financial status neither bolstered nor undermined his intent to profit from consulting.  As the ALJ found, "Kovarik does not appear to be a rich

man." That said, his income from his railroad pension and other retirement funds were enough to provide him with "a comfortable living in rural Iowa."

(9) Whether Kovarik engaged in consulting for personal pleasure or recreation rather than profit was hard to gauge. The ALJ believed he likely enjoyed attending the conventions and maintaining contact with others in the rail industry.

All told, these factors supported the ALJ's conclusion Kovarik lacked a good faith intention to profit from his consulting business—at least during the tax years at issue. The conclusion was logical and based on largely undisputed facts. *See* Iowa Code § 17A.19(10)(m). It was not unreasonable, capricious, or an abuse of discretion. *See* § 17A.19(10)(n). As a result, we must affirm on this issue. Next up is the second category of disallowed expenses.

## 2. Condominium Rental

While working out of Atlanta early in his career, Kovarik purchased a condominium in the suburb of Forest Park, Georgia. It served as his primary residence from 1974 through 1984, when his company transferred him to Virginia. He then purchased a second condominium in Roanoke, where he lived until his retirement in 1990. He did not sell either condominium when he moved back to Iowa. And he still owned both condominiums during the tax years at issue.

Kovarik said he kept the Roanoke condominium as rental property. He considered the Forest Park condominium as "potential" rental property but also used it as the headquarters for his consulting business.[9] He did little to market the properties. As a result, Kovarik was unsuccessful in leasing either condominium

---

[9] Kovarik reported utility costs and mileage for trips to the Georgia property for his rail car inspections.

during the tax years at issue. Yet Kovarik made regular trips to Virginia and Georgia to inspect the condominiums. On his Schedule E, Kovarik reported travel expenses for these inspections, as well as expenses for mortgage interest, property insurance, management fees, utility costs, depreciation, and furniture storage. For the Roanoke property, Kovarik reported total expenses and net losses of $68,241.40 for 2003 through 2006.

Like the analysis of the consulting business—but in an even more pronounced fashion—the ALJ found the nine-factor test tipped away from a true profit motive behind Kovarik's real estate holdings. For instance, the ALJ observed: "Kovarik offered no evidence to support a finding that he approached rental of the Roanoke condominium in a businesslike manner." He had no experience in renting residential real estate and sought no professional expertise. He traveled quarterly to inspect the property but stayed no longer than a day or two. The modest appreciation of the property did not speak to Kovarik's intent to profit from its rental. In fact, the properties showed a history of uninterrupted losses. And while he did not use the property for vacations, he also did not secure rental income. The ALJ's conclusions, adopted by the director, were reasonable, justified, and within the department's broad discretion. We affirm on this issue.

## C. Business Losses for Farmland Rental

In his final issue, Kovarik alleges the director made a mistake in disallowing certain farm-rental losses. Kovarik took over as the farm manager when his brother James died in March 2003.[10]

---

[10] In his will, Kovarik's brother named Kovarik and his sister as beneficiaries of the farmland. His estate remained open until 2008. Neither Kovarik nor the department

Kovarik reported personal expenses associated with the farming operation on his Schedule F totaling $92,836.84 for tax years 2003 through 2006.[11] For the same time period, he reported farm-rental income of $17,340—for a net loss of $75,496.84.

The department disallowed his entire reported loss. To a small degree, the ALJ disagreed. The ALJ summed up her disagreement: "Cash rental of the tillable land on a farm was a business pursuit engaged in for profit and a deduction of ordinary and necessary expenses related to this activity should have been allowed." The ALJ directed the department to reduce the tax assessments based on adjustments to the net losses related to the tillable land. The ALJ's proposed order specified two-thirds of Kovarik's expenses for travel to the farm and the entire amount of reported expenses for rental of vehicle or equipment, repairs, storage, and utilities be disallowed. The ALJ reasoned Kovarik was unable to explain how many of his claimed expenses "related to the rental of the farmland in any way."

On appeal, Kovarik claims the ALJ allowed the department to pursue a new issue after the administrative hearing. The new issue, in his estimation, centered on the "excessive" nature of the farm-related expenses claimed on his Schedule F. He maintains this procedure violated his right to due process. *See Wedergren v. Bd. of Dirs.*, 307 N.W.2d 12, 16 (Iowa 1981) ("To comport with due process, a

---

offered evidence showing when the estate transferred the land to the beneficiaries. The ALJ noted: "Even though the farmland was part of the James Kovarik estate for at least a portion of the assessment period, [Edward] Kovarik treated it as property that he owned." But at oral arguments, the department conceded the ALJ did not consider that circumstance when analyzing the validity of the farm-related deductions.

[11] As the district court noted, Kovarik's claimed expenses included "mileage for travel to inspect the property; the cost of insurance, taxes, and utilities (2003 only); storage and warehousing; the cost of constructing the building (2003-2004 only); vehicle and machinery rental fees; repairs and maintenance."

person must ordinarily be informed somehow of the issues involved in order to prevent surprise at the hearing and allow an opportunity to prepare.").

The department disputes Kovarik suffered any surprise from the inquiry into the deductibility of his claimed expenses at the contested case hearing. As the ALJ noted, Kovarik had notice before the hearing that the department doubted the deductibility of his farm-related expenses. At the hearing, Kovarik fielded questions about his travel—two or three times per week from Marion to Howard County (a roundtrip of 240 miles)—to check on the farmhouse and storage. For instance, the department's attorney asked: "But that wasn't really related to your business of renting out the farmland was it?" Kovarik answered: "Check on conditions of the farm. I don't know what the conditions of the fences were, or maybe if somebody else was in there." The attorney followed up: "And that didn't strike you as excessive?" Kovarik answered: "No because other people were doing it." Kovarik's counsel did not object to this line of questioning.

In our de novo review of his constitutional claim, we conclude Kovarik has not shown the department deprived him of notice or an opportunity to be heard on the claimed farm-related expenses. Kovarik had ample warning and an opportunity to respond to the department's questions about the frequency of his travels to the farm, as well as the storage, warehousing, and machinery expenses.

In the alternative, Kovarik argues we should reverse the director's decision under subsections (a), (b), (d), (f), (m), and (n) of section 17A.19(10). But Kovarik fails to flesh out his argument under any of these provisions. Our supreme court has determined the "widely varying standards of review" for different mistakes alleged under 17A.19(10) make it "essential for counsel to search for and pinpoint

the precise claim of error on appeal." *Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 196 (Iowa 2010). Absent that precision, we cannot entertain Kovarik's request to upend the director's determination of allowable farm-related expenses.

And even if we could process Kovarik's general complaint, no basis for reversal appears. The ALJ carefully analyzed whether expenses were ordinary and reasonable in carrying out the farm-rental business. The ALJ treated the farmhouse and non-income-producing portions of the farmstead separately from the leased, tillable acres. This separate treatment was justified under persuasive precedent examining comparable facts. *See Meinhardt,* 766 F.3d at 921 (rejecting taxpayers' argument leasing farm land and personal use of the farmhouse were one activity).

When examining the cash-rental activities, the ALJ recognized responsible land owners would routinely monitor the activity of a tenant, ensuring maintenance such as weed control and timely planting and harvest. But the ALJ found "no logical reason" to inspect the farm several times per week. The ALJ noted Kovarik offered no measure for discerning how much travel related to business purposes. The department conceded one-third of Kovarik's travel expenses related to supervision of the cash-rental tenant. The ALJ accepted that concession as a "generous view" of the allowable deductions.

The ALJ also concluded the expenses claimed for maintaining the homestead and storing personal property, such as vintage tractors, were unrelated to the cash-rental farm business. Because the ALJ's order, adopted by the director, was rational and logical, we decline to reverse.

**AFFIRMED.**