# IN THE SUPREME COURT OF IOWA

No. 08–0065

Filed February 12, 2010

**JACOBSON TRANSPORTATION COMPANY**
and **LIBERTY MUTUAL INSURANCE,**

Appellants,

vs.

**RUSSELL HARRIS,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

Employee seeks further review of court of appeals' decision reversing workers' compensation commissioner's calculation of a weekly compensation rate. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Kevin R. Rogers of Swisher & Cohrt, P.L.C., Waterloo, for appellants.

Michael L. Mock of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellee.

**HECHT, Justice.**

In this appeal, we must determine whether the workers' compensation commissioner properly excluded three weeks of earnings from the calculation of an injured employee's compensation rate. We conclude the commissioner did not err by excluding three weeks of low earnings and replacing them with earnings from three earlier weeks which more fairly represented the employee's customary earnings.

## I. Factual and Procedural Background.

Russell Harris (Harris) was hired by Jacobson Transportation Company (Jacobson) in April 2003 as an over-the-road truck driver. He was paid by the mile, and he was not guaranteed a minimum amount of work each week. Accordingly, the number of miles he drove each week varied depending on the assignments he received from Jacobson, but also on other factors such as traffic, speed limits, road construction, and weather. Harris's weekly earnings during his employment were as follows:[1]

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 04/26/2003 | $702.08 | 08/23/2003 | $958.72 |
| 05/03/2003 | $851.20 | 08/30/2003 | $667.20 |
| 05/10/2003 | $295.84 | 09/06/2003 | $892.64 |
| 05/17/2003 | $1117.12 | 09/13/2003 | $247.36 |
| 05/24/2003 | $764.80 | 09/20/2003 | $1036.48 |
| 05/31/2003 | $833.76 | 09/27/2003 | $944.00 |
| 06/07/2003 | $0.00 | 10/04/2003 | $227.52 |
| 06/14/2003 | $1710.08 | 10/11/2003 | $1223.76 |
| 06/21/2003 | $1068.64 | 10/18/2003 | $0.00 |
| 06/28/2003 | $538.24 | 10/25/2003 | $1183.52 |
| 07/05/2003 | $542.08 | 11/01/2003 | $870.72 |
| 07/12/2003 | $355.68 | 11/08/2003 | $1012.00 |
| 07/19/2003 | $698.59 | 11/15/2003 | $1128.32 |
| 07/26/2003 | $0.00 | 11/22/2003 | $940.16 |
| 08/02/2003 | $806.51 | 11/29/2003 | $662.40 |
| 08/09/2003 | $708.48 | 12/06/2003 | $453.92 |
| 08/16/2003 | $875.52 | | |

---

[1]This list of Harris's weekly earnings includes only his earnings up to the date of his injury, although he continued to work for Jacobson for several months after being injured.

On December 9, 2003, while unloading freight in California, Harris injured his low back. The injury was diagnosed as a lumbosacral and thoracic spine strain, and Harris was restricted to light-duty work by a physician. Harris received a series of spinal injections after returning to work, but in March 2004 he was unable to continue driving because of the injury.

From June 2004 through September 2005, Harris sought treatment from several different doctors. Their diagnoses were generally similar, although they disagreed about the best course of treatment and whether Harris had reached maximum medical improvement. Each of the doctors believed Harris was capable of light-duty work and recommended that he not return to truck driving.

In March 2005, Harris filed a claim for workers' compensation benefits. After an arbitration hearing on November 8, 2005, a deputy workers' compensation commissioner determined that Harris was permanently and totally disabled. The deputy commissioner calculated Harris's average weekly rate pursuant to Iowa Code section 85.36(6) (2003) by using the thirteen weeks immediately prior to his injury, although Harris had argued that his earnings in several of those weeks were nonrepresentative and should be excluded. The deputy found Harris's average weekly earnings were $827.52 and his weekly compensation rate was $483.99.[2]

---

[2]The deputy commissioner apparently excluded the week ending October 18, 2003, in which Harris had zero earnings and replaced it with the week ending September 6, 2003, in which Harris earned $892.64. The exclusion of that week from the calculation of Harris's wage rate has not been challenged in this case.

Both parties appealed, Jacobson[3] contending the deputy erred in concluding Harris was permanently and totally disabled and Harris contending the deputy calculated the average weekly rate incorrectly. In the appeal decision, the workers' compensation commissioner agreed with the deputy commissioner's finding that Harris is totally disabled. However, the commissioner concluded three of the thirteen weeks preceding Harris's injury were not representative[4] and should have been excluded from the calculation of Harris's average weekly earnings. Accordingly, the commissioner calculated Harris's average weekly earnings at $953.50 and his weekly compensation rate at $545.51.[5]

When calculating Harris's weekly compensation rate, the commissioner cited *Hanigan v. Hedstrom Concrete Products, Inc.*, 524 N.W.2d 158 (Iowa 1994), noting the "purpose of weekly compensation is to replace the probable earnings that were lost due to the injury." The commissioner then engaged in a lengthy analysis of Harris's compensation.

---

[3]Jacobson and its insurance carrier, Liberty Mutual Insurance, were codefendants before the agency and are copetitioners on judicial review. We refer to them jointly as "Jacobson" in this opinion.

[4]As in the deputy's arbitration award, the commissioner's appeal decision also did not include in the rate calculation the week of October 18 in which Harris had no earnings. Although there is some evidence in the record tending to prove Harris missed work in October because he was hunting, had the agency concluded Harris's lack of earnings were due to personal reasons, section 85.36(6) provides the weekly earnings for such period "shall be the amount [Harris] would have earned had [he] worked when work was available to other employees of [Jacobson] in a similar occupation." Iowa Code § 85.36(6). Neither the arbitration decision nor the appeal decision explains the exclusion of the October 18 earnings. As neither party challenges the commissioner's exclusion of the week of October 18 from consideration in the calculation of the weekly rate, we assume without deciding for purposes of our opinion that the exclusion was appropriate.

[5]Although the commissioner's appeal decision found Harris's weekly compensation rate was $549.90, an order nunc pro tunc was later entered conforming the rate to the applicable rate table.

The weekly earnings range from a high of $1,223.76 to a low of $227.52. When reviewing the distribution of earnings I find that there are five weeks in which claimant earned $1,012.00 or more per week. There were two weeks in which claimant earned $247.36 per week or less. Over the 30 weekly pay periods that claimant worked for the employer his total earnings were $24,317.34 . . . . The weekly average of claimant's total earnings is thus $810.58. For the thirteen weeks immediately prior to his work injury, claimant earned more than $810.58 in ten of those weeks.[6] It is concluded that claimant's average weekly wage should be calculated by discarding the weeks ending December 6, 2003 ($453.92), October 4, 2003 ($227.52), and September 13, 2003 ($247.36). By discarding those three weeks and adding earnings for the weeks ending August 30, 2003 ($667.20), August 23, 2003 ($958.72), and August 16, 2003 ($875.52) it is concluded that claimant's gross earnings for the period are $12,395.44. When divided by thirteen weeks the average weekly gross earnings are $953.50.

Jacobson sought judicial review, contending the commissioner erred both in determining Harris was permanently and totally disabled and in calculating Harris's weekly compensation. The district court affirmed the commissioner's decision. Jacobson appealed, and we transferred the case to the court of appeals. The court of appeals affirmed the disability decision, but reversed the commissioner's calculation of average weekly earnings and reinstated the deputy commissioner's lower calculation. We granted Harris's petition for further review to address the earnings issue.

## II. Scope of Review.

Our review of a decision of the workers' compensation commissioner varies depending on the type of error allegedly committed by the commissioner. If the error is one of fact, we must determine if the commissioner's findings are supported by substantial evidence. Iowa

---

[6]Although the commissioner states that ten of the thirteen weeks of earnings exceeded $810.58, our review of the earnings history indicates that Harris earned more than $810.58 in nine of the weeks.

Code § 17A.19(10)(*f*); *Meyer v. IBP, Inc.,* 710 N.W.2d 213, 219 (Iowa 2006). If the error is one of interpretation of law, we will determine whether the commissioner's interpretation is erroneous and substitute our judgment for that of the commissioner. Iowa Code § 17A.19(10)(*c*); *Meyer,* 710 N.W.2d at 219. If, however, the claimed error lies in the commissioner's application of the law to the facts, we will disturb the commissioner's decision if it is "[b]ased upon an irrational, illogical, or wholly unjustifiable application of law to fact." Iowa Code § 17A.19(10)(*m*); *Meyer,* 710 N.W.2d at 219. Because of the widely varying standards of review, it is "essential for counsel to search for and pinpoint the precise claim of error on appeal." *Meyer,* 710 N.W.2d at 219.

In this case, the commissioner concluded three of the thirteen weeks prior to Harris's injury did not fairly reflect his customary earnings and replaced them with weeks that he concluded did represent Harris's customary earnings. There is no factual dispute concerning the amount of Harris's wages in the weeks prior to the injury. The dispute centers instead on the commissioner's interpretation of the words "customary earnings" in Iowa Code section 85.36(6) and his application of the law to the facts. Accordingly, we must first determine whether the commissioner has misinterpreted the law. Iowa Code § 17A.19(10)(*c*); *Meyer,* 710 N.W.2d at 219. If the commissioner's interpretation of the law is correct, we will then review his application of the law to the facts to determine if it is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*m*); *Meyer,* 710 N.W.2d at 219.

### III. Discussion.

Iowa Code section 85.36 describes the basis for calculating a disabled employee's compensation rate. "The basis of compensation

shall be the weekly earnings of the injured employee at the time of the injury." Iowa Code § 85.36.

> In the case of an employee who is paid on a daily or hourly basis, or by the output of the employee, the weekly earnings shall be computed by dividing by thirteen the earnings, not including overtime or premium pay, of the employee earned in the employ of the employer in the last completed period of thirteen consecutive calendar weeks immediately preceding the injury. If the employee was absent from employment for reasons personal to the employee during part of the thirteen calendar weeks preceding the injury, the employee's weekly earnings shall be the amount the employee would have earned had the employee worked when work was available to other employees of the employer in a similar occupation. *A week which does not fairly reflect the employee's customary earnings shall be replaced by the closest previous week with earnings that fairly represent the employee's customary earnings.*

*Id.* § 85.36(6) (emphasis added).[7]

Jacobson alleges the commissioner misinterpreted the last sentence of this provision authorizing the replacement of weeks which do not reflect the employee's "customary earnings." Because Harris's weekly earnings fluctuated based on the number of miles he drove and because Harris was not guaranteed a uniform number of miles each week, Jacobson posits that the only customary feature of Harris's earnings is their variability. Accordingly, in the case of an employee like Harris, Jacobson argues, the statute does not authorize the commissioner to exclude weekly earnings simply because they are significantly lower than other weeks without an explanation for the low wages that provides a rationale beyond the expected fluctuation in miles occurring from week to week.

---

[7]The last two sentences, including the one at issue in this case, were added to the statute in 2000. 2000 Iowa Acts ch. 1007, § 2.

Our goal, when interpreting a statute, is to give effect to the intent of the legislature. *Griffin Pipe Prods. Co. v. Guarino*, 663 N.W.2d 862, 864 (Iowa 2003). To determine the intent of the legislature, we look first to the words of the statute itself as well as the context of the language at issue. *Id.* at 865. We seek to "interpret [the provision] in a manner consistent with the statute as an integrated whole." *Id.* Mindful that a fundamental purpose of the workers' compensation statute is to benefit the injured workers, we interpret chapter 85 "liberally in favor of the employee." *Id.*

> Consistent with the remedial nature of workers' compensation laws, statutes for computation of wage bases are "meant to be applied, not mechanically nor technically, but flexibly, with a view always to achieving the ultimate objective of reflecting fairly the claimant's probable future earning loss."

*Hanigan,* 524 N.W.2d at 160 (quoting 2 Arthur Larson, *Workmen's Compensation Law* § 60.11, at 10-622 (1994) (now found at 5 Arthur Larson & Lex Larson, *Larson's Workers' Compensation Law* § 93.01[1][c], at 93–7 (2009))).

We think our decision in *Griffin Pipe,* interpreting section 85.36(6), informs our analysis here. In that case, Guarino was an hourly-paid employee at the Griffin Pipe plant. *See Griffin Pipe,* 663 N.W.2d at 864. The plant was closed two weeks each summer and two weeks each winter for maintenance and cleaning. *Id.* During the semi-annual plant closures, Guarino did not work and did not earn any wages. *Id.* Guarino was injured on the job, and although the two-week winter closure occurred within the thirteen weeks immediately prior to his injury, the commissioner concluded those two weeks did not reflect his customary

earnings and replaced them with earnings from earlier weeks.[8] *Id.* The employer contended that because the plant closures were expected and occurred regularly, they were "customary" and accordingly Guarino's resulting two weeks of zero earnings should be included in the calculation of his weekly earnings.

In our review, we agreed with the commissioner's decision to replace the weeks when the plant was closed. Although the closing of the plant was planned and routine, we explicitly rejected any distinction between anticipated and unanticipated occurrences causing a reduction in an employee's wages.

> *Why* a particular week may not reflect the employee's customary hours is important only insofar as it might be relevant to whether the *hours* worked in that week are in fact customary. . . .
>
> We agree with the agency that the issue under section 85.36 "is whether the *hours of work* in any particular workweek are representative of *the hours typically or customarily worked by an employee during a typical or customary full week of work.*"

*Id.* at 866.

Although not in effect at the time of Guarino's injury, we also discussed the 2000 amendment to section 85.36(6) which added to the statute the language at issue in this case. *Griffin Pipe*, 663 N.W.2d at 867. We noted that while usually we presume a material change in a statute changes the law, we concluded this amendment was intended to clarify the statute because it was enacted after significant dispute within the legal community about the correct application of section 85.36. *Id.* Although we had previously interpreted section 85.36 to permit the

---

[8]Guarino's injury occurred before section 85.36(6) was amended adding the sentence explicitly requiring the replacement of weeks of earnings that do not fairly reflect the employee's customary earnings. However, as discussed, our interpretation of section 85.36(6) both before and after the amendment is relevant in this case.

replacement of a nontypical workweek with a typical workweek in the wage base calculation in *Thilges v. Snap-On Tools Corp.*, 528 N.W.2d 614, 619 (Iowa 1995), the issue arose again three years later in *Weishaar v. Snap-On Tools Corp.*, 582 N.W.2d 177, 183 (Iowa 1998). The amendment, explicitly adding language requiring that a nontypical week be replaced with a typical week of earnings when calculating an employee's compensation base,

> confirmed this court's interpretation of section 85.36. . . . Accordingly, to determine what weeks should be included in the compensation rate calculation one must ask whether the *earnings* attributable to a particular week are customary, not whether a particular absence from work is anticipated.

*Griffin Pipe*, 663 N.W.2d at 867.

Thus, in our interpretation of section 85.36, both before and after the addition of the language at issue in this case, we have determined that one must look to the earnings themselves to see if they are customary. The reason for the variance in earnings is not determinative of whether a week's earnings should be replaced because they are not customary.[9]

Next, then, we must address whether an employee whose earnings fluctuate each week can ever have atypical weekly earnings justifying replacement under section 85.36(6). Jacobson argues that because Harris's miles were not fixed or uniform each week, Harris's weekly earnings should have been calculated using the thirteen most recent weeks of earnings, without regard to the amount of his average

---

[9]The reason for nontypical wages is relevant if the employee was absent from work for reasons personal to the employee. As previously noted, section 85.36(6) provides for a different method of addressing a nontypical week of earnings due to personal reasons. In that case, the weekly wages must be replaced with the wages the employee "would have earned had the employee worked when work was available" to the employer's workers performing in a similar occupation. Iowa Code § 85.36(6).

earnings.[10]  In effect, Jacobson advocates for a bright-line rule that would preclude the replacement of a week's earnings under section 85.36 if the employee's earnings customarily vary from week to week.

We do not interpret the word "customary" so rigidly as to conclude that just because an employee's schedule or output is neither fixed nor guaranteed, the employee cannot have "customary" earnings. "Customary" means "based on or established by custom"; "commonly practiced, used or observed"; or "usual." *Merriam-Webster's Collegiate Dictionary* 285 (10th ed. 2002).  We have previously defined "customary" as "typical." *Griffin Pipe,* 663 N.W.2d at 866.  Ascertainment of an employee's customary earnings does not turn on a determination of what earnings are guaranteed or fixed; rather, it asks simply what earnings are usual or typical for that employee.  As discussed above, an employee need not justify the variance with a particular explanation.  The amount of the variance alone, by the magnitude of its departure from the usual earnings of the employee, may suffice to justify the exclusion of a week's earnings from the weekly rate calculation.  Put another way, even an employee whose wages fluctuate can have an unusually low or abnormally high week of output and resulting earnings.  We think it is important that when the legislature clarified its intent in the 2000 amendment to have atypical weeks excluded from the calculation, it added the language to section 85.36(6) which specifically addresses the calculation of weekly earnings for employees paid daily, hourly, or by output.  An employee like Harris, who is paid by output (miles driven), is likely to have fluctuating earnings.  The fact that the legislature included the language authorizing the exclusion of noncustomary earnings in this

---

[10]Again, Jacobson does not argue that the week ending October 18 with zero earnings should be included in the calculation.

subsection indicates it expected that even employees with variable earnings will on occasion have earnings that diverge from the customary.

We believe the commissioner's interpretation of "customary earnings" is compatible with the legislature's directive that injured employees' weekly rate of compensation shall be based on their "*average spendable weekly earnings*" at the time of the injury. Iowa Code § 85.34(2), (3) (emphasis added). The legislature's adoption of the concept of earnings-averaging as a first principle of rate calculation evidences an intention to base workers' compensation rates on an earnings history of several weeks that are more likely than earnings of a single week to fairly represent the claimant's probable future earning loss. The legislature's intent to provide even greater protection to injured workers with variable earnings from the harsh effects of basing the weekly rate of compensation on unusually low-pay weeks is clearly evidenced by the amendment to section 85.36(6) adopted in 2000. As amended, the section expressly authorizes the commissioner to exclude from the computation of average weekly earnings weeks in which injured employees' earnings do not fairly represent their customary earnings.

Our interpretation of "customary earnings" is further supported by the fact that all calculations of Harris's average weekly earnings, whether performed by either of the parties or by the agency, have replaced the October 18 week of zero earnings with an earlier week in which Harris had earnings. Although no explanation has been provided for this replacement, we think it demonstrates a common sense understanding of what is considered customary. Even for an employee like Harris whose earnings vary each week, a week of zero earnings is not customary. This raises the question: If a week of zero earnings is so low that it must be excluded as not typical, where should the line be drawn? What of a week

of $100 earnings?  Because we think the determination of what earnings are customary will depend on the specific facts of each case, we reject a bright-line rule that any employee whose wages vary may not have weeks excluded as noncustomary.  Instead, we think the determination of whether wages are customary under the circumstances is a matter expressly committed by section 85.36(6) to the discretion of the commissioner.  Accordingly, we conclude the commissioner correctly interpreted section 85.36(6).

We must next decide whether the commissioner's decision to replace the three weeks of Harris's earnings was illogical, irrational, or wholly unjustifiable in this case.  The commissioner's appeal decision discloses a careful and thorough consideration of Harris's earnings during each of the thirteen weeks immediately prior to the injury and a thoughtful comparison of how the earnings in those weeks compared with those paid to Harris during earlier weeks of employment with Jacobson.  After reviewing the weekly earnings and comparing them to the average weekly earnings for Harris's prior career as an employee of Jacobson, the commissioner concluded the earnings from three of the weeks were so low as to be not customary and replaced them with the immediately preceding three weeks of earnings.  In deciding whether Harris's earnings during the three disputed weeks were so substantially lower than what he usually earned as to be unrepresentative, we conclude the commissioner aptly compared the earnings from those weeks with Harris's broader earnings history.  When viewed in this way, the three weeks excluded by the commissioner were so far afield from Harris's usual earnings as to be fairly characterized as unrepresentative of customary earnings.

While we do not believe the analysis undertaken by the commissioner in this case is the only appropriate method of arriving at a determination of whether earnings are customary, we conclude it was reasonable under the circumstances presented here.

Jacobson contends that even if the commissioner did not err in excluding the three lowest weeks of earnings, it was irrational and arbitrary to exclude only the lowest weeks and not the highest weeks.[11] As we have already noted, workers' compensation statutes are to be interpreted and applied liberally and flexibly for the benefit of the worker. *Griffin Pipe*, 663 N.W.2d at 865; *Hanigan*, 524 N.W.2d at 160. The commissioner's decision that Harris's compensation during the three low weeks was exceptionally low, while the high weeks were not unusually high when compared to the earnings history was not arbitrary or unreasonable in this case. As acknowledged by the commissioner, nearly half of the thirteen weeks prior to the injury produced earnings of more than $1012.00, but only two weeks had income of $247.36 or less. The commissioner reasonably determined that most of the thirteen weeks of earnings exceeded $810.58, Harris's average weekly earnings for his entire preinjury career at Jacobson. When the range of Harris's weekly earnings is considered, as well as the distribution of the earnings, with most of the weekly earnings near the high end, the commissioner's decision to replace only the three lowest weeks because they were significantly lower than Harris's career average is not unreasonable. Given our standard of review, as well as the mandate to apply workers' compensation laws to benefit the worker, we conclude the

---

[11]It should be noted at this juncture that the legislature has provided protection to the employer from the risk of rate calculations based on weeks of unusually high earnings by excluding overtime and premium pay from average weekly wage computations. Iowa Code § 85.36(6).

commissioner's determination of customary earnings in this case is not illogical, irrational, or wholly unjustifiable.

### IV. Conclusion.

We agree with the workers' compensation commissioner's interpretation of section 85.36(6). His decision to replace three low weeks of earnings with weeks in which Harris's weekly earnings fairly represented customary earnings was not irrational, illogical, or wholly unjustifiable.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**