**IN THE COURT OF APPEALS OF IOWA**

No. 24-0711
Filed May 7, 2025


**ARCHER DANIELS MIDLAND,**
        Petitioner-Appellant/Cross-Appellee,

**vs.**

**DONALD TUTTLE,**
        Respondent-Appellee/Cross-Appellant.
_____


Appeal from the Iowa District Court for Polk County, Christopher Kemp,

Judge.


An employer appeals a judicial review ruling affirming an agency decision

granting an employee's request for alternate medical care for his head injury.  The

employee cross-appeals the district court's remand to the agency for a more

specific finding on his request for alternate care for his knee injury.  **REVERSED**

**ON APPEAL AND CROSS-APPEAL.**


Brandon W. Lobberecht (argued) and Peter J. Thill of Betty, Neuman &

McMahon, P.L.C., Davenport, for appellant/cross-appellee.

Dennis Currell (argued), Cedar Rapids, for appellee/cross-appellant.


Heard at oral argument by Tabor, C.J., Langholz, J., and Doyle, S.J.*

*Senior judge assigned by order under Iowa Code section 602.9206 (2025).

**TABOR, Chief Judge.**

Donald Tuttle sustained two work-related injuries during his employment at Archer Daniels Midland (ADM): a left knee injury and a head injury. The deputy workers' compensation commissioner granted Tuttle's requests for alternate medical care for both claims.[1] On judicial review, the district court affirmed the deputy's grant of alternate medical care for Tuttle's head injury but remanded the claim involving care for his knee to the deputy for a more specific finding.

ADM appeals that judicial review order, advancing three arguments concerning care for Tuttle's head injury: (1) the court erred in finding ADM unreasonably delayed treatment; (2) the court exceeded its jurisdiction and authority by making new factual findings not considered or relied upon by the deputy; and (3) even if the alleged treatment delay is actionable, the court erred in finding it was unreasonable under Iowa Code section 85.27(4) (2023). As for the knee injury, ADM argues the court erred in ordering a remand because there was insufficient evidence to conclude its authorized treatment was unreasonable. Tuttle cross-appeals, contending the remand was unnecessary because the agency applied the correct standard in making its factual findings.[2]

We reverse the district court's order affirming the head-injury portion of the deputy's alternate care decision. We also reverse the court's remand and affirm the deputy's decision granting alternate care for Tuttle's knee injury.

---

[1] The commissioner delegated authority to a deputy commissioner to issue a final agency decision in these matters.

[2] Tuttle also challenges the district court's "factual redetermination" of the status of the treating physician for his head injury but does not contest the court's affirmance of the deputy on that alternate care decision.

## I.    Facts and Prior Proceedings

Tuttle started working at ADM as a maintenance mechanic in 2015.  He injured his left knee at work in January 2018.  Tuttle returned to his job after that injury.  Then, in April 2022, he suffered a second work-related injury when he struck his head on a metal pipe, fell, and lost consciousness.

***Treatment for the knee injury.***    ADM chose the University of Iowa Hospitals and Clinics (UIHC) as the authorized treatment provider for Tuttle's knee injury.   UIHC performed an arthroscopy and partial medial meniscectomy in February 2018.  A post-operative MRI showed a retrograde drill tunnel in Tuttle's left tibial plateau.  In November 2020, Dr. Matthew Bollier and Dr. Nicolas Noiseux at UIHC asserted that "[t]he tibial tunnel is not the cause of Mr. Tuttle's pain and is not causing any damage in his knee."  They also opined that "Mr. Tuttle clearly has advanced left knee arthritis and needs a knee replacement."

Tuttle sought care on his own from Dr. Holly Duck at the Mayo Clinic.  In March 2022, Dr. Duck noted that "Tuttle has degenerative knee osteoarthritis" and his previous treatments included "NSAIDS, modalities such as ice or heat, topical creams such as voltaren gel, braces or wraps, physical therapy and injections."  At that visit, Dr. Duck placed orders for an "ultrasound guided injection of corticosteroid into the left pes anserine bursa/trigger point."  Dr. Duck also noted that Tuttle would eventually need a total knee arthroplasty.[3]

Tuttle saw Leah Edquist, P.A.-C., at Dr. Duck's office in January 2023.  Edquist noted that Tuttle received a "left knee intra-articular injection" at that visit,

---

[3] The deputy described this procedure as knee replacement surgery.

and she advised Tuttle "that we should continue with conservative management as long as possible." Edquist noted that Tuttle understood that the injections should continue as long as they provided him relief. She added:

> I am hopeful that we can put off needing anything operative for several years particularly given that he is at increased risk with his prior history of MRSA in his ankle. Only when he [has] completely exhausted nonoperative management should he consider knee replacement on the left side. . . . We will plan to see him back on an as-needed or yearly basis.

According to Tuttle's wife, Michelle, UIHC did not offer the injections that Tuttle received at the Mayo Clinic.[4] Michelle also recalled that the doctors at UIHC never advised Tuttle that he should wait until he exhausted nonoperative treatments before considering knee replacement. Michelle explained that the knee injections allowed Tuttle to return to work at ADM until his head injury.

***Treatment for the head injury.*** When Michelle arrived at ADM on April 14, 2022, to pick her husband up from work, he was in the on-site nurse's office because he hit his head. Michelle took him to a scheduled doctor's appointment that afternoon where she "realized there was something really wrong with him." After that appointment, Michelle called ADM's safety coordinator, Ryan Priddy. He directed Michelle to take her husband to an urgent care clinic. The urgent care clinic sent Tuttle to a hospital emergency room by ambulance. The emergency room physician ordered a head CT and diagnosed Tuttle with a "closed head injury," "contusion of neck," and "concussion without loss of consciousness." Tuttle's discharge papers from the emergency room instructed him to follow up

---

[4] Michelle was the only witness at the hearing before the deputy commissioner. For clarity, we use her first name and refer to her husband as Tuttle.

with his primary care physician, Dr. Jill Flory, and to schedule "an appointment as soon as possible for a visit in 1 week."

Tuttle saw Dr. Flory for a follow-up appointment in late April 2022. He continued to see Dr. Flory "every 7 to 12 days" so that she could monitor his recovery from the head injury. Michelle testified that at some point, they learned that "we were going to have to go to WorkWell, because ADM said they were not going to pay for him to go to any further appointments to Dr. Flory's." Tuttle arrived for an appointment at WorkWell on May 3 but left without seeing a doctor.[5] ADM scheduled another appointment at WorkWell for May 16, but Tuttle did not attend.[6] After that, Tuttle continued his treatment with Dr. Flory.

Dr. Flory referred Tuttle to Dr. Opada Alzohaili, an endocrinologist in Detroit, Michigan. Dr. Alzohaili diagnosed Tuttle with pituitary dysfunction and growth hormone deficiency in February 2023. Dr. Alzohaili recommended that Tuttle receive human growth hormone (HGH) injections for the rest of his life to treat those conditions. Michelle testified that Tuttle's "mood swings" and "balance issues" improved when he started the HGH injections. She further testified that the injections would not be covered through ADM's group health insurance after July 25, 2023.

---

[5] Michelle testified that they left that appointment after waiting about thirty-five to forty-five minutes because "there wasn't a doctor available," and WorkWell staff didn't "know if anyone from ADM" was coming to the appointment.

[6] Michelle explained: "[T]he fact that nobody showed up with his appointment on the 3rd, it seemed like they weren't real serious about this whole head injury. He's had some bad experiences in the past with the doctors who ADM has chosen. He just did not feel comfortable going back to ADM's doctor."

Meanwhile, Tuttle saw Dr. Erica Bellamkonda at the Mayo Clinic for a consultation in September 2022. Dr. Bellamkonda opined that Tuttle was "experiencing prolonged persistent concussive symptoms (post-concussion syndrome) . . . following mild traumatic head injury/concussion." She provided a list of treatment recommendations to Tuttle's counsel in May 2023. Dr. Bellamkonda also reviewed Dr. Alzohaili's recommendations, but she explained that she could not comment on Tuttle's hypothalamic-pituitary axis because it was outside her scope of expertise. She advised that if "there continue to be concerns regarding Mr. Tuttle's hypothalamic-pituitary axis, another opinion may be considered with direct referral to another endocrinologist."

Tuttle also saw Dr. Jonathan Fields for an independent medical examination (IME) arranged by ADM in September 2022. Dr. Fields diagnosed Tuttle with a mild traumatic brain injury and postconcussion syndrome. He opined that Tuttle "will need some ongoing treatment for his postconcussive syndrome" and recommended that he follow the Mayo Clinic's treatment plan.[7] Dr. Fields provided an updated opinion in February 2023 after reviewing Dr. Alzohaili's recommendations. Regarding the HGH injections, Dr. Fields recommended "a referral for a 2nd opinion to a local endocrinologist at the Mayo Clinic or the University of Iowa."

Following that recommendation, ADM requested a second opinion on the HGH injections from the Mayo Clinic and UIHC. The Mayo Clinic declined ADM's request. Dr. Amie Ogunsakin, an endocrinologist at UIHC, was willing to provide

---

[7] ADM asserts that it authorized the Mayo Clinic to treat Tuttle's head injury after it received Dr. Fields's IME report in October 2022.

a second opinion but—due to her workload—she was unavailable to evaluate Tuttle until August 2023 at the earliest.

***The alternate medical care proceedings.*** In July 2023, Tuttle requested alternate medical care for his knee and head injuries. Tuttle sought authorization to continue treatment for his knee injury with Dr. Duck at the Mayo Clinic. Tuttle also sought authorization to continue treatment for his head injury, including the prescribed HGH injections, with Dr. Alzohaili in Detroit. At the hearing on those requests, the deputy commissioner heard Michelle's testimony and considered the parties' exhibits and oral arguments.

The deputy granted Tuttle's requests for both injuries, reasoning:

> [W]ith respect to the knee injury, I find that the treatment being offered by the Mayo Clinic, specifically Dr. Duck's office, is more extensive and better suited to treat [Tuttle's] knee injury. There are documented concerns with [Tuttle] having a total knee replacement surgery, given his history of MRSA. That is the only treatment being offered by the University of Iowa at this time. However, Dr. Duck is providing yearly intra-articular injections, which provide [Tuttle] with enough relief to delay the total knee replacement for the time being. As such, the care being provided by Dr. Duck is better suited to treat [Tuttle's] knee injury and should be authorized.

The deputy continued:

> With respect to [Tuttle's] head injury, the issues are more complicated. However, looking at the case from the beginning, it does appear that Dr. Flory was the initial authorized treating physician, and there is no evidence her authorization has been revoked. The employer cannot interfere with the judgment of the authorized treating physician, and must authorize treatment modalities recommended by that provider. In this case, by way of Dr. Flory's referral, Dr. Alzohaili is also an authorized treating physician, and his recommendations must be authorized. As such, [ADM] is responsible for the HGH prescription he has recommended.

The deputy then addressed the delay in treatment for Tuttle's head injury, noting that ADM knew about Dr. Fields's recommendation for a second opinion since February 28, 2023.

> Understanding that the Mayo Clinic declined the request for a second opinion, the fact that there is no appointment scheduled at this time, and none available until late August at the earliest, is an unreasonable delay in treatment. [Tuttle] has already had to go off the medication once, and only has insurance approval through his group health for five more days. The injections have provided benefit, and stopping the injections had a negative effect. As such, it is unreasonable to make [Tuttle] wait until August or later for a second opinion before authorizing the prescription.

Thus, the deputy ordered ADM "to authorize and pay for [Tuttle's] treatment related to his left knee at the Mayo Clinic with Dr. Duck's office." The deputy also ordered ADM "to authorize and pay for [Tuttle's] treatment related to his head injury with Dr. Alzohaili, including authorization of the prescription for human growth hormone injections."

***The judicial review proceedings.*** ADM petitioned for judicial review, contending that the deputy erred in granting both alternate medical care requests. Following the judicial review hearing, the district court remanded to the commission "for a more specific finding regarding whether UIHC's care was unreasonable with respect to the knee injury" and affirmed the deputy's alternate medical care decision for the head injury. On the knee injury, the court reasoned:

> The Deputy made findings supported by substantial evidence that Dr. Duck's treatment at Mayo Clinic was "more extensive and better suited to treat [Tuttle's] knee injury." However, this finding only comes into play after a determination ADM's care is unreasonable. Because that express finding is not in the Ruling, this case must be remanded on that issue. The Deputy Commissioner shall clarify whether ADM's care plan of UIHC is unreasonable.

With respect to the head injury, the court first concluded that the "Deputy's finding that 'Dr. Flory was the initial authorized treating physician, and there is no evidence her authorization has been revoked' was not supported by substantial evidence." But the court affirmed the deputy's alternate medical care decision, reasoning:

> ADM contends that Mayo Clinic was the authorized treating provider for Tuttle's head injury starting in February 2023, following the independent medical examination by Dr. Fields in September 2022.[8] Mayo Clinic declined treatment, and an endocrinologist at the University of Iowa could not see Tuttle until August 2023. The Deputy found that this was an unreasonable delay in treatment, and therefore ADM's offered treatment was not offered promptly. . . . Substantial evidence supports this finding, especially since ADM did nothing between setting a May 16, 2022, appointment at WorkWell and the September 2022 IME. ADM's request that Tuttle wait until August 2023 to see their doctor at the University of Iowa would have caused further delays in treatment. The Deputy found that the HGH injections provided benefit, and stopping the injections had a negative effect. The care authorized by ADM was inferior and less extensive than other available care requested by Tuttle.

The court also concluded that the deputy's order requiring ADM to authorize Tuttle's treatment related to his head injury with Dr. Alzohaili, including the prescription for HGH injections, "was not an abuse of discretion."

ADM and Tuttle both filed motions to reconsider, enlarge, or amend. The court denied those motions. ADM appeals. Tuttle cross-appeals.

## II.    Scope and Standards of Review

The district court may grant relief on judicial review of an agency action only when that action (1) prejudiced the petitioner's substantial rights and (2) falls within

---

[8] ADM asserted in its judicial review brief that it "authorized Mayo Clinic to treat Claimant's head injury after Dr. Fields' October 17, 2022 report and recommendations." ADM maintains that assertion on appeal.

one of the criteria in Iowa Code section 17A.19(10). *See Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 256 (Iowa 2012). "We assess whether we come to the same conclusions as the district court." *Archer Daniels Midland v. Williams*, 3 N.W.3d 231, 234 (Iowa Ct. App. 2023). Our standard of review depends on the issues raised. *See Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 196 (Iowa 2010).

For claims of factual error, we determine if the commissioner's findings are supported by substantial evidence. Iowa Code § 17A.19(10)(f). We are bound by the fact findings "if supported by substantial evidence in the record as a whole." *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 218 (Iowa 2006). Evidence is substantial if it "would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." Iowa Code § 17A.19(10)(f)(1). We do not ask "whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence, viewing the record as a whole, supports the findings actually made." *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011). When the application of law to fact has been clearly vested in the commissioner's discretion, we will reverse only if the application is "irrational, illogical, or wholly unjustifiable." *See* Iowa Code § 17A.19(10)(m).

The parties disagree on which standard we apply. On the one hand, ADM maintains that our review is for correction of errors at law because the agency and the district court were mistaken in their interpretation and application of section 85.27(4). On the other hand, Tuttle urges substantial-evidence review. Because the parties dispute the factual findings underpinning the agency's

decision, we must first determine whether substantial evidence supports those findings. *See Jacobson Transp. Co.*, 778 N.W.2d at 196. From there, the parties dispute the proper application of section 85.27(4) to the facts of Tuttle's case. So we must decide whether the agency's application of the law is "irrational, illogical, or wholly unjustifiable." *See id.*

## III. Analysis

We begin with the statute providing injured workers with a procedure to seek alternate medical care. Iowa Code section 85.27(4) states:

> [T]he employer is obliged to furnish reasonable services and supplies to treat an injured employee, and has the right to choose the care. If the employer chooses the care, the employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization. . . . The treatment must be offered promptly and be reasonably suited to treat the injury without undue inconvenience to the employee. If the employee has reason to be dissatisfied with the care offered, the employee should communicate the basis of such dissatisfaction to the employer . . . following which the employer and the employee may agree to alternate care reasonably suited to treat the injury. If the employer and employee cannot agree on such alternate care, the commissioner may, upon application and reasonable proofs of the necessity therefor, allow and order other care.

This procedure "permits disputes over the medical care for compensable injuries to be quickly resolved in advance of a contested case hearing on a claim for workers' compensation benefits." *R.R. Donnelly & Sons v. Barnett*, 670 N.W.2d 190, 195 (Iowa 2003). The commissioner may order alternate care if the treatment provided by the employer is not prompt or reasonably suited to treat the injury or if the treatment causes "undue inconvenience to the employee." *Id.* The employee bears the burden of proving the medical care authorized by the employer is unreasonable. *Id.* "Determining what care is reasonable under the statute is a

question of fact." *Long v. Roberts Dairy Co.*, 528 N.W.2d 122, 123 (Iowa 1995). "[W]hen evidence is presented to the commissioner that the employer-authorized medical care has not been effective and that such care is 'inferior or less extensive' than other available care requested by the employee, the commissioner is justified by section 85.27 to order the alternate care." *Pirelli-Armstrong Tire Co. v. Reynolds*, 562 N.W.2d 433, 437 (Iowa 1997) (internal citation omitted).

For ease of analysis, we will first assess the parties' arguments addressing the district court's ruling on Tuttle's head injury. Then we will turn to their arguments relating to the ruling on Tuttle's knee injury.

### A. Head Injury

First, ADM argues that the district court erred in finding that it unreasonably delayed treatment under section 85.27(4) by seeking a second opinion regarding the HGH injections prescribed by Dr. Alzohaili—who was not an authorized treatment provider. ADM contends that when the district court "reversed the Deputy's finding that Dr. Alzohaili had been previously 'authorized' by ADM to treat Tuttle's head injury, it should have resulted in a reversal of the alternate care decision on Tuttle's head injury claim" because "[t]hat 'authorization' finding was the entire basis of the argument proffered by Tuttle to the Deputy and the entire basis for the Deputy granting alternative medical care to Tuttle."

ADM maintains that it has no duty under section 85.27(4) to approve care recommended by Dr. Alzohaili, "so long as ADM's chosen and authorized provider, Mayo Clinic, is providing treatment reasonably suited to treat the injury, promptly and without undue inconvenience." From there, the employer insists that it cannot "'delay' or fail to provide 'prompt' treatment by following the recommendations of

its chosen/selected medical provider and refusing to approve/authorize care recommended by an unauthorized provider." ADM urges us to reverse the district court because there is no evidence its authorized provider is not providing "reasonable, prompt and convenient care" for Tuttle's head injury.

Second, ADM argues that the district court exceeded its authority by making new factual findings not considered by the deputy.[9] For instance, ADM contends that the court made a "new finding of a purported 'delay'" in treatment. ADM also claims that the court improperly found "[t]he care authorized by ADM was inferior and less extensive than other available care requested by Tuttle." ADM alleges that the court impermissibly used these new findings to affirm the alternate care ruling on different grounds than expressed by the deputy. Further confusing the issue, in ADM's view, the district court "appears to assume that Dr. Fields is a chosen/authorized treatment provider of ADM, that his recommendations must be followed by ADM, and that the failure to follow such recommendations can lead to a 'delay' in treatment." As ADM points out, Dr. Fields was a retained expert who performed an IME, not a treating provider. Based on these flaws, ADM urges us to "disregard any such findings" in our review.

---

[9] As a purported cross-appeal claim, Tuttle also challenges the district court's "factual redetermination of Dr. Flory's authorized treating provider status" for his head injury. According to Tuttle, the "total lack of evidence in the record that ADM ever provided Mr. Tuttle with a reasonable basis for the transfer of authorization away from Dr. Flory supports the Deputy's evidentiary factual finding Dr. Flory's authorized status was never revoked." Thus, Tuttle alleges that "the district court engaged in fact-finding and then utilized an inappropriate legal standard and a 'scrutinizing analysis' to conclude that Dr. Flory's authorization was properly revoked." But Tuttle does not contest the district court's affirmance of the head-injury portion of the deputy's alternate care decision. So we treat Tuttle's claim as an argument that we should affirm the deputy on a different ground. But, as we explain, that ground lacks merit.

Third, ADM argues that even if the time between Dr. Fields's recommendation for a second opinion in February 2023 and Dr. Ogunsakin's availability to provide that opinion in August 2023 counted as a delay, the district court erred in finding it was unreasonable under section 85.27(4). ADM contends that the statute "implicitly contemplates the employer must play a role in causing the delay" before it loses its right to choose who provides the medical care. Building from that contention, ADM insists that characterizing Dr. Ogunsakin's booked schedule as unreasonable conduct of the employer is "unfair, unjust and legally erroneous in the absence of evidence ADM could have done more or acted differently to reach a quicker result." Thus, as a fallback position, ADM urges that we should reverse the district court's ruling regarding Tuttle's head injury by finding there is insufficient evidence to show the delay in treatment was unreasonable under section 85.27(4).

Tuttle responds that the district court correctly affirmed his request for alternate care for his head injury. In his view, the record supported the deputy's finding that Dr. Alzohaili was an authorized treating provider and that ADM unreasonably delayed medical care for Tuttle's traumatic brain injury. He emphasizes his wife's testimony that his symptoms improved while he was receiving the HGH injections and the deputy's finding that it was "unreasonable to make [him] wait until August or later for a second opinion before authorizing the prescription." Based on that record, Tuttle contends the "district court was bound

by the Deputy's factual finding that ADM's delay was unreasonable and correctly affirmed that factual finding."[10]

Starting with ADM's authorization argument, we agree with the district court's conclusion that the record lacked substantial evidence to support the deputy's finding that "Dr. Flory was the initial authorized treating physician, and there is *no evidence* her authorization has been revoked." (Emphasis added.) Assuming without deciding that the emergency room discharge instructions initially authorized Dr. Flory to treat Tuttle, no evidence suggested that ADM directed Dr. Flory to provide continuing care for Tuttle's head injury. To the contrary, Michelle testified that she and Tuttle were informed that "we were going to have to go to WorkWell, because ADM said they were not going to pay for him to go to any further appointments" with Dr. Flory. And in explaining why Tuttle chose not to attend the appointment ADM scheduled for him at WorkWell on May 16, 2022, Michelle explained: "He just did not feel comfortable going back to ADM's doctor."

Thus, the record contradicted the deputy's factual finding that there was "no evidence" Dr. Flory's authorization had been revoked. Michelle's testimony *was evidence* that ADM did not authorize Dr. Flory to provide continuing care for Tuttle's head injury. Yet Tuttle continued seeing Dr. Flory despite knowing the employer directed him elsewhere. *See Ramirez-Trujillo v. Quality Egg, L.L.C.*, 878 N.W.2d 759, 776–77 (Iowa 2016) (finding section 85.27(4) does not permit "an

---

[10] Tuttle also challenges error preservation and urges us to dismiss ADM's appeal because "ADM's failure to make any arguments regarding the final ruling of the district court in its Ruling on Motions to Reconsider forfeited challenges to the final findings and conclusions of the district court and agency." We find no merit in those arguments and decline to dismiss ADM's appeal.

employee to take advantage of an employer by seeking compensation after the fact for care the employee knew or should have known was not within the scope of the employer's prior authorization"). It follows that the deputy's finding that "by way of Dr. Flory's referral, Dr. Alzohaili is also an authorized treating physician, and his recommendations must be authorized" was likewise unsupported by substantial evidence. As ADM explained, the deputy's "flow of authorization" finding with respect to Dr. Flory and Dr. Alzohaili underpinned the agency order that ADM "authorize and pay for" the HGH injections Dr. Alzohaili prescribed. Because substantial evidence did not support those findings, the deputy erred in granting Tuttle's alternate care request for his head injury based on that reasoning.

The deputy also erred in granting alternate care based on the alleged "delay in treatment" between Dr. Fields's recommendation for a second opinion on the HGH injections and Dr. Ogunsakin's availability. Section 85.27(4) gives the employer the right to select the employee's care. *West Side Transp. v. Cordell*, 601 N.W.2d 691, 693 (Iowa 1999). That right is qualified by requirements that the treatment be "(1) prompt, (2) reasonably suited to treat the injury, and (3) without undue inconvenience to the [employee]." *Id.* "[I]f the treatment the employer offers fails to meet any one of these qualifications, the commissioner has the authority to order alternate care, including care from a doctor chosen by the [employee]." *Id.* It is Tuttle's burden to prove that the care authorized by ADM is unreasonable. *See R.R. Donnelly &* Sons, 670 N.W.2d at 195.

Tuttle hasn't met that burden for his head injury. Because Dr. Alzohaili was not an authorized provider, section 85.27(4)'s requirement that the "treatment must be offered promptly" did not apply to the HGH injections he prescribed. *See West*

*Side Transp.*, 601 N.W.2d at 693 (applying statutory requirements only to treatment offered by the employer). Tuttle presented no evidence that the Mayo Clinic—ADM's chosen provider—recommended HGH injections. And Tuttle did not argue that the Mayo Clinic's treatment recommendations for his head injury were unreasonable, unduly inconvenient, or not offered promptly. Nor did the deputy make any such findings. On this record, the deputy erred in ordering alternate care based on ADM's alleged "unreasonable delay" in approving the HGH injections. We reverse the district court's ruling affirming the head-injury portion of the deputy's alternate care decision.

### B. Knee Injury

Shifting to Tuttle's knee injury, both ADM and Tuttle object to the remand. For its part, ADM argues there is insufficient evidence to conclude its authorized treatment was unreasonable. The employer contends the deputy incorrectly focused on whether the unauthorized care Tuttle received from Mayo Clinic was reasonable and beneficial but never found that the authorized care from UIHC was unreasonable. ADM cites *Lynch Livestock, Inc. v. Bursell*, for the proposition that an agency's finding that "the treatment requested is reasonable does not result in an 'implicit' finding that the authorized treatment was unreasonable." No. 14-1133, 2015 WL 2394143, at *3 (Iowa Ct. App. May 20, 2015). ADM emphasizes that UIHC and Mayo Clinic agree that Tuttle will eventually need a total knee replacement—the only difference is that Mayo Clinic offers knee injections to postpone the need for surgery. And while ADM acknowledges Tuttle presented evidence that he "personally desired to pursue treatment only with Mayo Clinic for his left knee rather than UIHC," it insists that evidence "is insufficient as a matter

of law to deem UIHC's treatments unreasonable." *See id.* Thus, ADM urges us to "reverse the District Court's remand order and affirm the Court's reversal[11] of the alternate care decision regarding Tuttle's left knee claim as a final adjudication."

In his cross-appeal, Tuttle argues that the deputy's factual finding that "the treatment being offered by the Mayo Clinic . . . is more extensive and better suited to treat [Tuttle's] knee injury" is supported by substantial evidence and legally equivalent to finding that UIHC's recommended treatment is unreasonable. He points to *Pirelli-Armstrong*, which affirmed that offering no care to the claimant is the same as offering "no care reasonably suited to treat the injury." 562 N.W.2d at 436.[12] Tuttle asserts that "[r]emand was unnecessary because the deputy utilized the correct language in arriving at the fact-finding conclusion of unreasonable care in her Alternate Medical Care Ruling." As a remedy, Tuttle urges that the "Alternate Medical Care Ruling regarding the medical care for [his] knee injury by the Mayo Clinic should be reinstated following reversal of the district court's judicial review adjudications."

We agree with Tuttle on this issue. The deputy correctly articulated the legal standard for alternate care under *Pirelli-Armstrong* and confirmed that "determining whether care is reasonable under the statute is a question of fact" immediately before finding that the "treatment being offered by the Mayo Clinic . . . is more extensive and better suited to treat [Tuttle's] knee injury." The

---

[11] The district court ordered that the "Decision of the Deputy be REMANDED to the agency for a more specific finding regarding whether UIHC's care was unreasonable with respect to the knee injury." The court did not order reversal.
[12] ADM responds that *Pirelli-Armstrong* "is not dispositive of this case nor are the facts analogous."

deputy further found there were "documented concerns with [Tuttle] having a total knee replacement surgery, given his history of MRSA"; knee replacement surgery was "the only treatment being offered by the University of Iowa at this time"; and the injections Tuttle received from Mayo Clinic provided him "with enough relief to delay the total knee replacement for the time being." On our review, we find substantial evidence in the record supports those findings. "The commissioner—not the court—weighs the evidence, and we are obliged to broadly and liberally apply those findings to uphold rather than defeat the commissioner's decision." *Long*, 528 N.W.2d at 123.

True, the deputy did not expressly state that UIHC's recommended treatment was unreasonable. But we can deduce from the agency decision that the deputy must have concluded UIHC's offered treatment was ineffective and inferior or less extensive than the treatment offered by the Mayo Clinic. *See Pirelli-Armstrong*, 562 N.W.2d at 437; *Bridgestone/Firestone v. Accordino*, 561 N.W.2d 60, 62 (Iowa 1997) ("[T]he commissioner's duty to furnish a reasoned opinion [is] satisfied if it is possible to work backward and to deduce what must have been the agency's legal conclusions and its findings of fact." (cleaned up)). The deputy's decision to grant alternate care for Tuttle's knee injury was not based upon an irrational, illogical, or wholly unjustifiable application of section 85.27(4). *See* Iowa Code § 17A.19(10)(m). We reverse the district court's ruling remanding the knee-injury portion of the agency decision and affirm the deputy's grant of alternate care for Tuttle's knee injury.

**REVERSED ON APPEAL AND CROSS-APPEAL.**